## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| CLARENCE POWELL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 16-cv-01452-JES-JEH |
| | ) | |
| ILLINOIS DEPARTMENT OF | ) | |
| CORRECTIONS, | ) | |
| | ) | |
| Defendant. | ) | |

## <u>ORDER AND OPINION</u>

Now before the Court is Defendant's Motion for Summary Judgment (Doc. 45). For the

reasons set forth below, Defendant's Motion (Doc. 45) is DENIED.

### BACKGROUND

The following facts are undisputed between the parties. Plaintiff Clarence Powell is a

black male employee of Defendant Illinois Department of Corrections ("IDOC"). Plaintiff

worked as a Correctional Officer at Pontiac Correctional Center from November 8, 1999 until

March 30, 2016. He remains an IDOC employee, now working at the Peoria ATC Work Release

facility. During Plaintiff's time at Pontiac Correctional Center, his work included monitoring

inmates, bringing them food, and preventing fights within the facility. Doc. 46, ¶¶ 1–4. While

working at Pontiac Correctional Center, Plaintiff submitted a number of incident reports to IDOC

regarding his experiences with racial epithets, physical mistreatment, and transfers to undesirable

work assignments by IDOC employees. Doc. 46, ¶¶ 17, 24, 31, 36, 43, 77.  He also filed multiple

complaints with the Equal Employment Opportunity Commission ("EEOC"). *Id.*, ¶ 96. In April

2016, Plaintiff brought this action under Title VII, seeking recovery from IDOC for harassment,

discrimination (disparate treatment), and retaliation. The parties dispute the nature of the conduct

underlying those allegations, the supervisory status of the alleged perpetrators, and the sufficiency of IDOC's response. Because genuine issues of material fact remain, summary judgment is denied. This Order follows.

1. *Incidents Between 2006 and 2008*

In 2006, Plaintiff requested time off from his shift commander, Lieutenant Craig Davis, so that he could attend a convention of the National Association of Blacks in Criminal Justice. According to Plaintiff, this was in the presence of Lieutenants Benny Dallas and Eugene Masching, who reacted negatively; Lt. Dallas called the organization a "black gang," and Lt. Masching expressed his opinion that Plaintiff should not be allowed to take time off to attend the convention. Lt. Davis did allow Plaintiff time off in order to attend, but when Plaintiff returned, Lt. Dallas was the acting shift commander. Lt. Dallas assigned Plaintiff to the Upper PC housing unit on days when Lt. Dallas was working as the shift commander. Doc. 46, ¶¶ 12–15.

Plaintiff suffers from asthma. According to Plaintiff, the Upper PC housing unit was the only housing unit in which inmates could smoke at the time, and this aggravated his medical condition. Defendant contends that the entire facility permitted smoking, although Defendant attached documentation from 2007 wherein Plaintiff alleged that the Upper PC housing unit was the only one that allowed smoking. Doc. 46, Exh. 5. Plaintiff submitted an incident report to IDOC, citing Lt. Dallas' statements about the convention and claiming that Plaintiff's reassignment to the Upper PC housing unit was retaliation from Lieutenant Dallas for getting the time off he requested. Lt. Dallas received a one-day suspension from IDOC for making a discriminatory comment. *Id.* ¶¶ 16–19; Doc. 50, ¶ 2.

During the IDOC investigation into Lt. Dallas, Lt. Masching approached Plaintiff and told him, "I'm going to get you." Doc. 46, ¶ 21. Plaintiff reported this as well, and Lt. Masching

received counseling for making that statement. Then, in mid-2007, when Lt. Dallas returned from his suspension, Plaintiff was reassigned permanently to the Upper PC housing unit. According to Plaintiff, this was a retaliatory action by Lts. Dallas and Masching based on his complaints against them. *Id.*, ¶ 22.

In his Opposition to Defendant's Motion for Summary Judgment, Plaintiff did not dispute that Lt. Masching only learned of Plaintiff's complaints against him at the time of the deposition. Doc. 48, p. 3; Doc. 46, ¶ 69 (citing Exh. 11, p. 9). However, both parties also agree that Lt. Masching received counseling as a direct result of Plaintiff's IDOC complaint about him in 2006. Doc. 46, ¶ 21. Defendant also does not dispute that Lts. Dallas and Masching reassigned Plaintiff to a smoking section of the facility after he complained of racially harassing comments in front of Lt. Masching. Doc. 50, ¶ 1.

The parties agree that Plaintiff submitted multiple complaints to IDOC about his assignment, as well as Workers' Compensation notices about his medical complications from his exposure to the smoke. The issue resolved itself when an Illinois law came into effect prohibiting smoking in prisons altogether. Not long after the law came into effect, Lts. Dallas and Masching transferred to different units, and Plaintiff did not encounter either of them again until 2014. Doc. 46, ¶¶ 24–26.

2. *Incidents Between 2013 and 2014*

Plaintiff contends that Superintendent Melvin disciplined him in 2013–2014 for taking medical leave for his asthma permitted by the FMLA. He was placed on "proof status," where he needed to provide a letter from his doctor when he returned from a sick day, and he was given mandatory attendance counseling for the days he missed. Plaintiff filed a grievance about this

disciplinary action, which resulted in the expungement of those disciplinary actions from his record. Doc. 46, ¶¶ 84–89.

In January 2014, Plaintiff was working in the Medium Security Unit ("MSU"). His Lieutenant at the time, Duane Beal, allegedly made racially-charged threats three or four times, including a threat to "slap the black off your face and hang you by an oak tree." Doc. 46, ¶ 27. Plaintiff repeatedly asked Lt. Beal to stop, but did not report his conduct until January 8, 2014, when it had escalated to physical contact. *Id.*, ¶¶ 29–30, Exh. 7. In his IDOC Incident Report, Plaintiff claimed that Lt. Beal had singled him out for a shakedown, during which he was "sticking [his] hand inside my pants." *Id.,* Exh. 7. Plaintiff then went on to complain that Lt. Beal had made racialized threats against him, and that the lieutenant had also called other staff members derogatory names. *Id.* IDOC investigated the incident and suspended Lt. Beal for 25 days. Doc. 46, ¶ 33. When he returned from the suspension, he was transferred out of MSU and had no further contact with Plaintiff.

Later that year, Lt. Masching once again came in contact with the Plaintiff—he transferred from his maintenance position to a position in the MSU on the same shift as Plaintiff. Doc. 46, ¶ 35. On July 19, 2014, Plaintiff filed an incident report alleging harassment by Lt. Masching. Plaintiff restated in the incident report that Lt. Masching had a history of problems with Plaintiff, and went on to note that Lt. Masching was coming to the control cage and sitting with him every night, which was not correct procedure. Doc. 46, Exh. 10. After the incident report was filed, Lt. Masching stopped sitting in the control room with Plaintiff. Doc. 46, ¶ 40.

### 3. Incidents After November 18, 2014

Defendant claims that any acts outside the limitations period of 300 days before the right-to-sue letters were filed are time-barred. Thus, according to Defendant, the only incidents that are

relevant to this action were the ones that occurred after November 18, 2014. Doc. 46, p. 18. Those incidents are as follows.

On March 25, 2015, Plaintiff filed an IDOC incident report based on his transfer by Lt. Masching to C-Dorm rather than general relief. Doc. 46, Exh. 12. This assignment is the closest one to the Shift Commander's office, and faced the kitchen, which was kept dark at night. Doc. 46, ¶¶ 45, 50. Plaintiff holds that Lieutenant Masching had made the transfer to harass him; Plaintiff alleged that Lt. Masching would hide in the dark kitchen, watching him hyper-vigilantly, and that the only other person Lt. Masching treated this way was the only other black employee on the shift. Doc. 46, Exh. 12. Plaintiff also claimed that Lt. Masching would hide in the dark shower area and jump out at Plaintiff to scare him when he made his rounds. Doc. 48, p. 7. Lt. Masching claims that he routinely observed correctional officers by standing in different places to ensure they were making their required rounds. Doc. 46, ¶ 53.

Later, on August 6, 2015, Lt. Masching reported Plaintiff and Lt. Evans (who is Caucasian) for allegedly sleeping on the job. Doc. 46, ¶ 58. Plaintiff contends that this was a false accusation. *Id.*, ¶ 59. After a hearing, Plaintiff received a one-day suspension, which was later reversed and replaced with counseling. *Id.*, ¶¶ 62, 64.

Finally, Plaintiff alleges that in September 2015, Lt. Masching defaced a lockout memorandum in the Shift Commander's office with Plaintiff's picture on it, writing the words "fucking nigger" on the memorandum. Plaintiff filed an incident report on October 2, 2015 describing what had happened. According to Plaintiff, he walked into the Shift Commander's office on September 29, 2015, when Lt. Masching and another correctional officer were present in the room. He saw the memorandum on the wall, with the offensive remark written on it, and took it down quietly in order to avoid a conflict. He then made a copy of the memorandum to

attach to his report and filed it promptly. Doc. 46, Exh. 15. IDOC investigated, but was unable to determine who had defaced the memorandum. Doc. 46, ¶ 80. During that investigation, Plaintiff said that he did not know who had written on the picture. *Id.*, ¶ 79. Plaintiff now contends that, based on the circumstances, it was more likely than not Lt. Masching. In support of this assertion, Plaintiff points to the fact that Lt. Masching was in the room at the time he discovered the memorandum and that Lt. Masching had other lockout memoranda in his desk for apparently no reason. Doc. 46, Exh. 1, p. 186; Doc. 48, p. 16. After the investigation, IDOC heightened security around the lockout memoranda to prevent future incidents, but it did not counsel employees on appropriate conduct or take steps other than altering the policy about the display of lockout memoranda. Doc. 50, ¶ 6.

   *4. EEOC Complaints*

   Plaintiff claims that he filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") in 2005 or 2006, complaining of conduct by Lts. Dallas and Masching. Doc. 46, Exh. 1, p. 24. According to Plaintiff, he never received a Notice of Right to Sue from the EEOC regarding that complaint. *Id.*

   The parties agree that Plaintiff submitted Charges of Discrimination with the EEOC on September 14, 2015 and November 24, 2015. Doc. 46, ¶ 96; Doc. 46, Exh. 16. The parties also agree that Plaintiff received Notices of Right to Sue on January 27, 2016 and on March 31, 2016 for those two Charges of Discrimination. Doc. 46, ¶ 96. Plaintiff filed his initial complaint in this case on April 25, 2016. Doc. 1.

LEGAL STANDARD

   Summary judgment is proper where the materials in the record demonstrate that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

6

law." Fed. R. Civ. P. 56. The role of the judge in resolving a motion for summary judgment is not to weigh the evidence for its truth but to determine whether sufficient evidence exists that a jury could return a verdict in favor of the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Thus, in order to survive a motion for summary judgment, the non-movant must show specific facts that demonstrate the existence of genuine issues for trial. *Id.* The Court will construe the record "in the light most favorable to the non-movant" in deciding whether the case involves genuine issues of fact requiring a trial. *Payne v. Pauley*, 337 F.2d 767, 770 (7th Cir. 2003). However, mere allegations in the complaint by a non-movant plaintiff will not suffice; instead, they must show admissible evidence such as depositions that show genuine disputes of material fact. Fed. R. Civ. P. 56(e)(2); *Behrens v. Pelletier*, 516 U.S. 299, 309 (1996).

In a harassment claim that asserts a hostile work environment, a plaintiff must show that 1. he was subject to unwelcome harassment, 2. the harassment was based on his race, 3. the harassment was severe or pervasive enough to alter the conditions of his work environment by creating a hostile or abusive situation, and 4. there is a basis for employer liability. See *Williams v. Waste Management of Illinois*, 361 F.3d 1021, 1029 (7th Cir. 2004). The fourth prong is evaluated differently based on the status of the alleged harassers as supervisors or coworkers. See *id.* If they are supervisors, then the employer is strictly liable, with the exception of an affirmative defense where there is no tangible employment action. *Id.* If the alleged harassers are coworkers, then the plaintiff must show that the employer has been negligent in discovering or remedying the harassment in order to recover against the employer. *Id.* (citing *Mason v. S. Ill. Univ. at Carbondale*, 233 F.3d 1036, 1043 (7th Cir. 1998)).

In an employment discrimination claim under Title VII, a plaintiff bears the initial burden of establishing a *prima facie* case that the defendant discriminated against him "with respect to

his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." *Ricci v. DeStefano*, 557 U.S. 557, 577 (2009); see *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). Having done so, the burden shifts to the employer to point to some nondiscriminatory reason for the adverse employment action. *McDonnell*, 411 U.S. at 802. Where the employer meets that burden, plaintiffs must show that the employer's reasons are a pretext for discrimination or that the decision was corrupted by race-based motives. See *Johnson v. Cambridge Industries, Inc.*, 325 F.3d 892, 897 (7th Cir. 2003). If the evidence, considered as a whole, would permit a reasonable factfinder to conclude that the plaintiff's race caused the adverse employment action, then summary judgment for the defendant should be denied. See *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765 (7th Cir. 2016).

Similarly, a plaintiff bringing a Title VII retaliation claim must make a *prima facie* case that the plaintiff 1. engaged in an activity protected under the statute and 2. suffered an adverse employment action as a result of that protected activity. See *Owens v. Old Wisconsin Sausage Co., Inc.*, 870 F.3d 662, 668 (7th Cir. 2017). Protected activities include steps taken in opposition to a form of Title VII discrimination, where the employee had a good-faith basis for believing that the conduct he opposed was unlawful. See *id.* Pursuant to *Ortiz*, the evidence is taken as a whole, rather than sorted into "direct" and "indirect" categories, but the *McDonnell* burden-shifting framework remains; if the employer can show a nondiscriminatory reason for the challenged action, then the burden returns to the employee to show that that reason is a pretext. See *Ferrill v. Oak Creek-Franklin Joint School Dist.*, 860 F.3d 494, 500 (7th Cir. 2017).

**DISCUSSION**

*1. Timeliness*

Before addressing the individual claims, it is necessary to determine which factual allegations are time-barred and which are appropriate bases for the claims. Defendant asserts that all claims based on conduct that occurred before November 18, 2014 should be dismissed because Title VII requires charges of employment discrimination to be filed within 300 days of the unlawful practice. Doc. 46, p. 17; 42 U.S.C. § 2000e-5(e)(1); see *Stepney v. Naperville School Dist. 203*, 392 F.3d 236 (7th Cir. 2004) (affirming a grant of summary judgment based on the statute of limitations in an employment discrimination case). Plaintiff responds that the earlier conduct was part of the same employment practice creating a hostile work environment, and thus that the Court should consider otherwise time-barred incidents. Doc. 48, p. 10; see *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002) ("Provided than an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability."). For the reasons below, Plaintiff is correct that the earlier conduct may be considered for the harassment claim, which rests on a theory of a hostile work environment. However, the conduct before November 18, 2014 may not be considered for the disparate treatment or retaliation claims. See *Adams v. City of Indianapolis*, 742 F.3d 720, 729–30 (7th Cir. 2014) (noting that the continuing violation doctrine is available for hostile work environment claims but not claims of discrete discriminatory actions or retaliation).

Defendant cites *Stepney v. Naperville School Dist. 203*, 392 F.3d 236 (7th Cir. 2004), for the proposition that none of the pre-limitations period conduct may be considered for any of Plaintiff's three Title VII claims. Doc. 46, p. 17. That case does not avail Defendant here because

the only alleged actionable behavior that occurred within the limitations period in that case was a failure to remedy the previous harms—the plaintiff in that case could not claim there was a continuing hostile work environment because no sufficient act contributing to the claim occurred during the limitations period. In this case, new incidents of harassment and racial epithets are alleged to have occurred within the limitations period, placing it more squarely in the realm of an ongoing hostile work environment contemplated by the Supreme Court in *National Railroad Passenger Corp. v. Morgan.* See *Morgan*, 536 U.S. at 120. Additionally, Defendant is incorrect that victims of harassment are prohibited from alleging continuing violations where the victim had reason to know the harassment was actionable before the limitations period ran on that conduct. Doc. 50, p. 6 (citing *Hardin v. S.C. Johnson & Son, Inc.*, 167 F.3d 340, 344 (7th Cir. 1999)). The Supreme Court explicitly rejected this limit to the continuing violation doctrine in 2002, abrogating the Seventh Circuit's decision from *Galloway v. General Motors Service Parts Operations*, 78 F.3d 1164 (7th Cir. 1996). *Morgan*, 536 U.S. at 117–18, n. 11; abrogation recognized by *Tinner v. United Ins. Co. of America*, 308 F.3d 697, 708 (7th Cir. 2002), *Lucas v. Chicago Transit Authority*, 367 F.3d 714, 727 (7th Cir. 2004), and *Passanti v. Cook County*, 689 F.3d 655, 665 (7th Cir. 2012).

It therefore falls to the Court to determine whether Plaintiff has alleged actionable harassment rising to the level of a hostile work environment, or merely discrete discriminatory acts. See *Morgan*, 536 U.S. at 120. Factors for a determination of an actionable hostile work environment claim include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 23 (1993). Taking the record in the light most favorable to the non-movant, Plaintiff

has indeed met this burden. He has alleged discriminatory conduct with negative physical health consequences, physical assault, racially-charged threats, and retaliatory actions by multiple IDOC employees. See *Morgan*, 536 U.S. at 121 (affirming a finding of hostile work environment where claims were limited to racially derogatory remarks and acts, even without a threat of physical violence).

Plaintiff's allegations involve a significant lapse in time during which no discriminatory behavior occurred (2008 through 2013). In some cases, such a lapse will preclude a finding of a continuous hostile environment. See *Selan v. Kiley*, 969 F.2d 560, 568 (7th Cir. 1992) (two incidents, two years apart, did not suffice to show a continuing violation); *Milligan-Grimstad v. Stanley*, 877 F.3d 705, 713 (7th Cir. 2017) (two broad periods of harassment, each with different alleged perpetrators, separated by two years, were not one continuous practice). However, a reasonable finder of fact could conclude that Plaintiff's collective allegations relate to one pattern of discrimination. This is particularly so because the same lieutenant whose behavior is addressed by the complaints within the limitations period is also alleged to have harassed Plaintiff before the limitations period; the break in time occurred while Lt. Masching was transferred to an assignment where he did not have contact with Plaintiff. See *Turner v. The Saloon, Ltd.*, 595 F.3d 679, 684–85 (7th Cir. 2010) ("[T]he court should have analyzed whether all of [the alleged harasser]'s conduct, taken as a whole, created an actionable hostile work environment."); *Morgan*, 536 U.S. at 120 ("[T]he pre- and post-limitations period incidents involve the same type of employment actions, occurred relatively frequently, and were perpetrated by the same managers."). Even while Lt. Masching was not in contact with him, Plaintiff alleges he experienced harassment from two different superiors, Superintendent Melvin and Lt. Beal. Doc. 46, ¶¶ 27, 30, 84. The number of claims, the nature of the claims, and the

alleged effects of the claims, taken in the light most favorable to Plaintiff, suffice to show one pattern contributing to a hostile work environment. As such, the Court will consider the incidents from outside of the 300-day limitations period with respect to the harassment claim.

*2. Count One: Harassment*

In order to survive a motion for summary judgment, a plaintiff bringing a racial harassment claim must show that 1. he was subject to unwelcome harassment, 2. the harassment was based on his race, 3. the harassment was severe or pervasive enough to alter the conditions of his work environment by creating a hostile or abusive situation, and 4. there is a basis for employer liability. See *Williams*, 361 F.3d at 1029. Defendant has moved for summary judgment, claiming that Plaintiff cannot show the last three of those four elements. The Court will examine each of those three elements in turn.

*A. Harassment Basis in Race*

First, taking the evidence in the light most favorable to Plaintiff, he has indeed demonstrated that the harassment giving rise to a hostile environment was based on his race. To do so, he needed to attribute a racial "character or purpose" to the harassment. See *Vance v. Ball State University*, 646 F.3d 461, 470 (7th Cir. 2011) (finding no race-based harassment where there were no racially derogatory comments); *Hardin v. S.C. Johnson & Son, Inc.*, 167 F.3d 340, 345 (7th Cir. 1999). Here, Plaintiff has documentation of numerous derogatory remarks based on race, racially-charged threats, and the use of a racial slur to deface a photograph of Plaintiff in a gathering area of the workplace. Plaintiff's allegations against Lts. Dallas, Masching, and Beal suffice to attribute a racial character to their alleged harassment and the work environment that harassment created.

Defendant claims that Plaintiff cannot show that Lt. Masching's behavior was motivated by race, pointing to Lt. Masching's behavior in 2015. Doc. 46, p. 25. However, Plaintiff alleges that the harassment by Lt. Masching began after Lt. Dallas called the National Association of Blacks in Criminal Justice a "black gang" and Lt. Masching said Plaintiff should not be able to get time off to attend the NABCJ conference. Doc. 46, ¶ 13. According to Plaintiff, Lt. Masching began harassing him after Plaintiff reported these inappropriate comments and Lt. Dallas was sanctioned. *Id.*, ¶ 19. Lt. Masching allegedly told Plaintiff "I'm going to get you" after this sanction. *Id.*, ¶ 21. Plaintiff also alleges that Lt. Masching was likely the person who defaced his picture with a racial slur in 2015; in support of this, Plaintiff points to Lt. Masching's past behavior towards him, the fact that Lt. Masching had access to the Shift Commander Office, and the fact that Lt. Masching had a series of lock-out memoranda stored in his desk with pictures of the correctional officers on them, for which Plaintiff claims there could be no reason other than to post the memoranda with derogatory writing on them. Doc. 48, p. 3. As the record demonstrates material questions of fact with regard to the basis in race for the harassment, summary judgment is inappropriate on that ground.

### B. Severity of Harassment

Third, Plaintiff has shown that the harassment was severe or pervasive enough to alter the conditions of his work environment. The two most compelling grounds for this finding are his claims that he was wrongly assigned to a smoking area, causing serious physical health consequences due to his asthma, and that he was physically assaulted by Lt. Beal. Doc. 46, ¶¶ 15–17, 30. Although Defendant correctly asserts that coworkers' isolated uses of racial slurs would not rise to the level of a hostile work environment, Plaintiff has alleged significantly more than that. Doc. 46, p. 20 (citing *Peters v. Renaissance Hotel Operating Co.*, 307 F.3d 535, 552

(7th Cir. 2002). Far from isolated racial epithets, Plaintiff has alleged (and the record contains support for) multiple derogatory racial comments by lieutenants, racialized physical threats, physical assault, work assignments detrimental to his health, and wrongful disciplinary action motivated by his race. The Court must look at the totality of the circumstances in determining whether the combined incidents were collectively severe or pervasive enough to alter the conditions of employment, including whether the conduct was physically threatening or humiliating rather than merely offensive utterances. See *Turner*, 595 F.3d at 685 (citing *Hostetler v. Quality Dining, Inc.*, 218 F.3d 798, 806–07 (7th Cir. 2000)).

Generally, courts leave the question of whether harassment rose to the level of a hostile work environment for the finder of fact. See *Johnson v. Advocate Health and Hospitals Corp.*, 892 F.3d 887, 901 (7th Cir. 2018) ("Whether harassment was so severe or pervasive as to constitute a hostile work environment is generally a question of fact for the jury."). The record in this case, taken in the light most favorable to Plaintiff, could demonstrate to a reasonable jury that the alleged harassment crossed the line from offensive to abusive conduct. The Court accordingly does not grant summary judgment on this ground.

### C. Basis for IDOC Liability

Fourth, Plaintiff has demonstrated a basis for employer liability on his claims. Defendant argues that IDOC should not be held liable for several reasons: Lt. Beal was not a "supervisor," IDOC was not negligent in discovering any alleged mistreatment, and IDOC took prompt corrective action in response to Plaintiff's complaints. Defendant also claims that IDOC cannot be held liable because Plaintiff suffered no tangible employment action, IDOC exercised reasonable care to prevent and correct any harassment, and Plaintiff unreasonably failed to take advantage of corrective opportunities. Doc. 46, p. 22.

Supervisors possess the ability to affect the terms and conditions of a person's employment, which primarily entails "the power to hire, fire, demote, promote, *transfer*, or discipline an employee." See *Valentine v. City of Chicago*, 452 F.2d 670, 678 (7th Cir. 2005) (quoting *Parkins v. Civil Contractors of Illinois, Inc.*, 163 F.3d 1027, 1034 (7th Cir. 1998)) (emphasis added). Only some of that authority, not each component, needs to be entrusted to a particular person in order for that person to qualify as a supervisor under Title VII. *Id.* Lts. Dallas and Masching could—and did—transfer Plaintiff to an assignment in a smoking section of the facility that seriously impacted his working conditions and his physical health, at one point resulting in a trip the emergency room. Doc. 46, ¶¶ 15, 22; Doc. 48, p. 4; Doc. 50, p. 2. Defendant's contention that Lt. Beal was not a supervisor (and Defendant's tacit agreement that Lts. Masching and Dallas were supervisors, see Doc. 50, p. 4) falls flat. Plaintiff was subject to the same authority under Lt. Beal at the time of the alleged harassment that he was under Lts. Masching and Dallas during the times of their alleged harassment, and he requested a transfer to work under a different lieutenant after Lt. Beal crossed the line. Doc. 5, ¶ 21; Doc. 46, Exh. 8, p. 8. IDOC documentation itself is also illuminative as to the supervisory status of Lt. Beal; in the memorandum regarding Lt. Beal's hearing, IDOC found that Lt. Beal's threat to "slap the black off your face" was inappropriate "as a member of supervisory rank speaking to his staff," referred to Plaintiff as "subordinate staff," and found that Lt. Beal failed to exercise the professionalism that is "the responsibility of every supervisor" at the correctional center. Doc. 46, Exh. 9, p. 2. Given Lt. Beal's power to initiate disciplinary proceedings against Plaintiff (Doc. 46, Exh. 9, p. 2) and his identical hierarchical status as concededly direct supervisors who had the power to transfer Plaintiff, Lt. Beal is properly considered a supervisor in this case under

Title VII. *See also Fields v. Illinois Dept. of Corrections*, 2006 WL 2645200 at *14 (S.D. Ill. 2006) (finding IDOC lieutenants are supervisors for Title VII purposes).

IDOC is strictly liable for harassment by supervisors that results in a tangible employment action such as "discharge, demotion, or undesirable reassignment." *Jackson v. County of Racine*, 474 F.3d 493, 501 (7th Cir. 2007). There remains a material question of fact as to whether there was a tangible employment action in this case. Plaintiff alleges that he was reassigned to the only smoking location on the site, which aggravated his asthma and caused him medical problems. Doc. 48, p. 11. Because a reasonable finder of fact could determine that this reassignment was sufficiently undesirable to amount to a tangible employment action, IDOC may be strictly liable for their employees' harassment.

Even if none of the alleged employment actions qualified as "tangible," the Court denies summary judgment because IDOC may still be liable under the framework of its *Ellerth-Faragher* affirmative defense. Defendant claims that IDOC exercised reasonable care to prevent and correct any harassment, and that Plaintiff unreasonably failed to take advantage of preventive or corrective opportunities. Doc. 46, p. 22 (citing *Cerros v. Steel Techs., Inc.*, 398 F.3d 944, 951–52 (7th Cir. 2005)). However, the record shows numerous internal IDOC documents demonstrating Plaintiff's repeated use of the internal complaint system to report harassing incidents; Defendant attached the IDOC documentation from December 19, 2006; April 29, 2007; May 12, 13, and 18, 2007; January 8, 2014; February 26, 2014; May 12, 2014; July 17, 2014; March 25, 2015; and October 2, 2015, as well as Plaintiff's later EEOC complaints. Doc. 46, Exhs. 5–10, 12, 15, 16. Whether Defendant's corrective action as a result of these numerous reports was reasonable is a question of fact inappropriate for resolution at summary judgment. *See Advocate Health*, 892 F.3d at 908 (describing the effectiveness of an employer's corrective

action as a question of fact, reversing a grant of summary judgment). Plaintiff asserts that the affirmative defense fails because IDOC did not reasonably address the harassment, citing IDOC's decisions to punish the harassing incidents with counseling, short suspensions, or no discipline at all. Doc. 48, pp. 15–16. Because material questions of fact remain on this point, summary judgment is denied.

*3. Count Two: Disparate Treatment*

As explained above, the claim of disparate treatment under Title VII must be limited to occurrences within the limitations period, or 300 days before Plaintiff received right-to-sue letters from the EEOC. This means that Plaintiff's claims on the second two counts are limited to his allegations from 2015 that Lt. Masching wrongfully transferred him to a unit closer to Lt. Masching, hyper-vigilantly watched him, jumped out at him in the dark, falsely reported him for sleeping on the job, and defaced a picture of Plaintiff with a racial slur. Doc. 46, ¶¶ 43–83.

Defendant asserts that, as a matter of law, Plaintiff cannot show evidence that would permit a reasonable finder of fact to conclude that his race caused any adverse employment action, citing *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760 (7th Cir. 2016). Doc. 46, p. 24. Plaintiff contends that the transfer to the unit closest to Lt. Masching, the false report, and the hostile environment created by Masching were each adverse employment actions, and that Lt. Masching's behavior is sufficient to infer racial motive for those actions. Doc. 48, p. 14; Doc. 46, ¶¶ 46, 59. Defendant, on the other hand, holds that none of the allegations against Masching qualify as adverse employment actions, that they were not race-motivated, and that Lt. Masching was not the person who defaced the photograph of Plaintiff. Doc. 46, pp. 14, 26–28.

A lateral transfer that significantly reduces an employee's career prospects by preventing him from using his skills and experience can constitute a materially adverse employment action,

as can changes in work conditions that subject an employee to a degrading work environment. See *Nichols v. S. Ill. Univ. Edwardsville*, 510 F.3d 772, 780 (7th Cir. 2007) (citing *O'Neal v. City of Chicago*, 392 F.3d 909, 911 (7th Cir. 2004)). A lateral transfer that involves only a minor change in working conditions does not qualify as an adverse employment action. See *id.* Here, there is support in the record for a finding that Lt. Masching significantly changed Plaintiff's working conditions by transferring him to C-Dorm in order to personally harass and degrade him. See, e.g., Doc. 46, Exh. 12. There is also sufficient evidence in the record for a reasonable factfinder to conclude that Plaintiff's testimony and incident reports are credible, and therefore that Lt. Masching defaced a picture of Plaintiff with a racial slur. Doc. 46, Exh. 15; Doc. 48, p. 3. Additionally, taking Plaintiff's testimony and the IDOC incident report from March 25, 2015 in the light most favorable to Plaintiff, a factfinder could also conclude that Lt. Masching harassed Plaintiff and one other black correctional officer, without harassing any white correctional officers. Doc. 46, Exh. 12; Doc. 48, p. 7. Even without considering Lt. Masching's interactions with Plaintiff before 2015, this would suggest that his behavior toward Plaintiff was motivated by racial animus, and supports Plaintiff's claim of disparate treatment. See *Johnson v. Artim Transp. System, Inc.*, 826 F.2d 538, 542 (7th Cir. 1987) (stating that racial animus could be demonstrated by showing that similarly-situated white employees were treated differently than the black plaintiff).

Defendant wrongly asserts that a suspension that is later withdrawn cannot constitute a materially adverse employment action, citing *Whittaker v. N. Ill. Univ.*, 424 F.3d 640, 647 (7th Cir. 2005). Doc. 46, p. 26. In that case, a suspension without pay was never served because the plaintiff voluntarily left her job before the suspension would have gone into effect. *Whittaker*, 424 F.3d at 647. Here, the only reason Plaintiff did not serve his suspension based on

Lt. Masching's accusation was because Plaintiff successfully appealed the suspension. Doc. 48, p. 14. Where adverse employment actions are instated but later reversed, they remain actionable under Title VII. See, e.g., *Ezell v. Potter*, 400 F.3d 1041, 1049 (7th Cir. 2005) (citing *Molnar v. Booth*, 229 F.3d 593, 600–01 (7th Cir. 2000)); *Goodwin v. Board of Trustees of Univ. of Ill.*, 442 F.3d 611, 619 (7th Cir. 2006). This is because supervisors would otherwise be free to perform discriminatory or retaliatory adverse employment actions "with impunity, so long as they later reversed" the action. *Ezell*, 400 F.3d at 1049. Although damages are limited to the period during which the action remained in effect, the adverse action itself remains a suitable ground for a Title VII claim. *Id.* As such, drawing all inferences in favor of the non-moving Plaintiff, he has made a sufficient showing that his suspension based on Lt. Masching's false report may constitute an adverse employment action.

The existence of a materially adverse employment action and the presence of racial motivation for that action are both disputed questions of fact in this case. A reasonable finder of fact, taking the evidence in the light most favorable to Plaintiff, could find that Lt. Masching did take at least one (and perhaps more than one) adverse employment action against Plaintiff because of racial animus towards Plaintiff. Thus, summary judgment is denied as to the disparate treatment claim.

*4. Count Three: Retaliation*

Count three, like count two, must be limited to the events within the statute of limitations, as there is no continuing violation doctrine exception for retaliation claims under Title VII. See *Adams*, 742 F.3d at 729–30. Plaintiff's claims within that time period all relate to Lt. Masching's behavior in 2015. Doc. 46, ¶¶ 43–83. Defendant claims that none of this behavior amounted to an adverse employment action, and that even if it did, Plaintiff cannot show a causal connection

between his reports of harassment by Lt. Masching and the subsequent alleged harassment, because of the temporal gaps between the complaints and the alleged harassment. Doc. 46, pp. 24, 28–29 (citing *Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 563 (7th Cir. 2016)).

As stated in the previous section, Plaintiff has made a sufficient showing of an adverse employment action to survive summary judgment. He has also shown that he engaged in a protected activity under Title VII, by filing internal IDOC complaints opposing what he believed to be unlawful discriminatory conduct. See *Owens*, 870 F.3d at 668. The only question that remains for the Court to decide is whether a reasonable finder of fact could conclude that the alleged adverse actions were the result of his complaints.

Many plaintiffs bringing Title VII retaliation claims rely entirely on the timing of the alleged retaliatory action after the protected activity to demonstrate causation. See *Benuzzi v. Board of Edu. of City of Chicago*, 647 F.3d 652, 665 (7th Cir. 2011). Defendant points out that the months-long gaps between complaints by Plaintiff and alleged retaliatory actions by Lt. Masching do not support an inference of causation based on suspicious timing alone. Doc. 46, pp. 28–29. But Plaintiff does not rest the causation argument on timing alone. Rather than asserting, as did the plaintiff in *Benuzzi*, that he reported discriminatory conduct and was subsequently fired, Plaintiff claims that he reported a specific supervisor's discriminatory conduct and was subsequently transferred, wrongly disciplined, and harassed by that specific supervisor. Doc. 46, ¶¶ 46, 50, 59, 70; Doc. 48, p. 3, 6–7. This case more closely resembles those where a supervisor "had an obvious motive to retaliate" and was in a position to do so personally. *Robinson v. Perales*, 894 F.3d 818, 832 (7th Cir. 2018) (vacating summary judgment on a retaliation claim, finding sufficient causation alleged). Taking Lt. Masching's behavior as a whole, including his alleged use of a racial slur on a picture of Plaintiff and the absence of other

reasonable motives to perform actions like jumping out at Plaintiff in the dark, a reasonable factfinder could conclude that he materially and adversely affected Plaintiff's working conditions as retaliation for Plaintiff's complaints of Lt. Masching's discriminatory behavior. Summary judgment on the retaliation claim is therefore denied.

## CONCLUSION

For the reasons set forth above, Defendant's [45] Motion for Summary Judgment is DENIED.

Signed on this 9th day of October, 2018.

*/s James E. Shadid*
James E. Shadid
Chief United States District Judge